Slip Op 13 - 130

# UNITED STATES COURT OF INTERNATIONAL TRADE

DIAMOND SAWBLADES
MANUFACTURERS COALITION,

                Plaintiff,

             v.

UNITED STATES,

                Defendant,

        and

EHWA DIAMOND INDUSTRIAL CO., LTD.,
SH TRADING, INC., and SHINHAN DIAMOND
INDUSTRIAL CO. LTD.,

          Defendant-Intervenors.

Before: R. Kenton Musgrave, Senior Judge
Consol. Court No. 06-00248

**PUBLIC VERSION**

## OPINION AND ORDER

[Remanding in part investigation of sales at less than fair value of diamond sawblades and parts from the Republic of Korea.]

Dated: October 11, 2013

    *Daniel B. Pickard* and *Maureen E. Thorson*, Wiley, Rein & Fielding, LLP, of Washington, D.C., for plaintiff Diamond Sawblades Manufacturers Coalition.

    *Eric C. Emerson* and *Laura R. Ardito*, Steptoe and Johnson, LLP, of Washington, D.C., for consolidated plaintiff Hyosung D&P Co., Ltd.

    *Delisa M. Sanchez*, Trial Attorney, and *Melissa M. Devine*, Of Counsel Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With them on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of Counsel on the brief was *Hardeep K. Josan*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

*Max F. Shutzman*, *Bruce M. Mitchell*, *Mark E. Pardo*, *Ned H. Marshak*, and *Andrew T. Shutz*, Grunfeld, Desiderio, Lebowitz, Silverman & Kledstadt, LLP, of Washington, D.C., for defendant-intervenor Ehwa Diamond Industrial Co., Ltd.

*Michael P. House* and *Sabahat Chaudhary,* Perkins Coie, LLP, of Washington, D.C., for defendant-intervenors SH Trading Inc. and Shinhan Diamond Industrial Co. Ltd.

Musgrave, Senior Judge:   This opinion addresses the merits of consolidated challenges to aspects of the investigation into sales of diamond sawblades and parts thereof from the Republic of Korea at less than "fair" value ("LTFV").  *See Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 Fed. Reg. 29310 (May 22, 2006) (final LTFV determ.)  ("*Final Determination*"), as ministerially amended by *Diamond Sawblades and Parts Thereof from the Republic of Korea*, 75 Fed. Reg. 14126 (Mar. 24, 2010).  Familiarity is presumed on the background of this matter[1] as well as the standard of judicial review, 19 U.S.C. §1516a(b)(l)(B)(i) (whether the

---

[1] *See, e.g.*, *Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea*, 70 Fed. Reg. 35625 (June 21, 2005) (initiation of investigation into LTFV sales), PDoc 75; *Diamond Sawblades and Parts Thereof from the Republic of Korea*, 70 Fed. Reg. 77135 (Dec. 29, 2005) (notice of, *inter alia*, preliminary LTFV determ.), PDoc 345; *Final Determination*, 71 Fed. Reg. 29310; *Diamond Sawblades and Parts Thereof from . . . the Republic of Korea*, 74 Fed. Reg. 6570 (Feb. 10, 2009) (notice of court decision not in harmony with final determination of the antidumping duty ("AD") investigations); *Amended Final Determination*, 75 Fed. Reg. 14126; *Diamond Sawblades and Parts Thereof from . . . the Republic of Korea*, 74 Fed. Reg. 57145 (Nov. 9, 2009) (AD order); *Diamond Sawblades Manufacturers Coalition v. United States*, 35 CIT __, Slip Op. 11-117 (Sep. 22, 2011) (denying motion for temporary restraining order and preliminary injunction as unripe ); Order of Oct. 13, 2011, ECF No. 56 (granting temporary restraining order in part and enjoining administrative lifting of suspension of liquidation); Order of Oct. 24, 2011, ECF No. 58 (granting motion for preliminary injunction against administrative lifting of suspension of liquidation and denying motion to enjoin revocation of AD duty order); *Notice of Implementation of Determination Under Section 129 of the Uruguay Round Agreements Act and Revocation of the Antidumping Duty Order on Diamond Sawblades and Parts Thereof [f]rom the Republic of Korea*, 76 Fed. Reg. 66892 (Oct. 28, 2011); *Diamond Sawblades Manufacturers Coalition v. United States*, 35 CIT __, Slip Op. 11-137 (Nov. 3, 2011) (publishing reasons for Order of Oct. 24, 2011); *Diamond Sawblades Manufacturers Coalition v. United States*, 36 CIT __, Slip
(continued...)

administrative determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law"), which necessarily frames the issues.  The reasonableness of agency action is assessed in light of the record as a whole.  *E.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  On that basis, the case will be remanded as follows.

*Discussion*

Addressed in order, the defendant's International Trade Administration of the U.S. Department of Commerce ("Commerce") contends (I) jurisdiction is lacking over post-section-126-determination entries but (II) agrees to remand of the determination not to adjust the total indirect selling expenses ("ISEs") for respondent Ehwa Diamond Industrial Co., Ltd. ("Ehwa") to account for expenses attributable to Ehwa's "Industrial Division."   The plaintiff, Diamond Sawblades Manufacturers Coalition ("DSMC"), additionally faults the *Final Determination* for the following: (III) non-inclusion of ISEs incurred in the transaction of subject merchandise through Ehwa and its U.S. affiliates to ultimate purchasers; (IV) non-collapse of various affiliations, namely (A) Ehwa and Shinhan Diamond Industrial Co., Ltd ("Shinhan"), (B) Shinhan and its Korean affiliates, and (C) Ehwa and its affiliates in the People's Republic of China ("PRC"), as well as (D) the impact such non-collapsing had on the weighted average CONNUMs of subject merchandise sold but not produced during the period of investigation ("POI") and the calculation of separate constructed export price ("CEP") offsets for Ehwa and Shinhan; (V) the country of origin determination for finished diamond sawblades; (VI) non-issuance of Section E questionnaires to respondents and

---

[1] (...continued)
Op. 12-46 (Mar. 29, 2012) (denying motion to amend injunction).  As used above and herein, "PDoc" refers to the public administrative record and "CDoc" refers to the confidential administrative record.

therefore (VII) non-deducted further manufacturing costs from U.S. Net Price and unadjusted CEP

profit; (VIII) non-application of the major input rule in the adjustment of prices for Ehwa's and

Shinhan's purchases from affiliated suppliers; (XI) unadjusted costs of reported purchases from

unaffiliated non-market economy ("NME") suppliers; (X) and the decision not to base Shinhan's

financial expense rate on facts otherwise available and/or adverse inferences.   The consolidated

plaintiff Hyosung D&P Co., Ltd. ("Hyosung") and the defendant-intervenors Ehwa and Shinhan,

joined by Shinhan's U.S. affiliate SH Trading, Inc., move to contest (XI) Commerce's determination

to employ its traditional zeroing methodology.

## I.  Jurisdiction

Jurisdiction is here pursuant to 19 U.S.C. §1516a(a)(3) and 28 U.S.C. §1581(c), but

the defendant again contends none exists with respect to Commerce's determination under section

129 of the Uruguay Round Agreements Act ("URAA") to revoke the AD order on subject

merchandise, and therefore the court lacks jurisdiction over the entries effected thereby.

To repeat: The defendant is correct that no jurisdiction exists over the section 129

determination, since the DSMC did not challenge it, but that does not translate to automatic

divestment of jurisdiction over the entries covered by the administrative decision to revoke.

Following in the wake of the section 129 determination, Commerce's decision to revoke the AD

order is independent of that determination, and the entries it would effect necessarily remain subject

to this action.  *See*, *e.g.*, 36 CIT ___, Slip Op. 12-46 (Mar. 29, 2012).  In other words, the opportunity

to challenge the section 129 determination is indeed a separate matter, but the decision to revoke the

AD order is "final" only in the sense that the section 129 determination (upon which that revocation

decision depends) may not be challenged judicially.  That does not equate to a powerlessness to rescind the revocation, should the final outcome of this matter so require, because it is not the legality of the section 129 determination currently supporting revocation in the first instance that governs jurisdiction here.  The outcome of this action in fact governs the "continued propriety" (for want of a better phrase) of that revocation,[2] and this court continues to adhere to the view that Commerce cannot act to divest this court of the jurisdiction here retained, nor deprive the court of the ability to grant relief over any of the entries covered by such jurisdiction, and for which liquidation continues to be suspended.  The *status quo* of this matter is of an AD order that is based

---

[2]  During the hearing on the DSMC's motion for preliminary injunction the court asked the DSMC whether the "cleaner" procedural avenue would be to bring a separate challenge to the section 129 determination and then consolidate that action with its LTFV action here.  The DSMC argued that such a procedure was not only unnecessary but inappropriate, as the section 129 determination was technically correct as it stood, *i.e.*, based on the record before Commerce at the time and before any final judicial decision on this matter affecting the margin calculus, and therefore it had no lawful basis to contest that determination.  Reflecting on the argument, the court agreed that a merely technical appeal of that section 129 determination was unnecessary in order for the DSMC to preserve a right of reinstatement of the AD order, were it to prevail on the issues it raises in its LTFV appeal here.  *See, e.g.*, *Globe Metallurgical Inc. v. United States*, 31 CIT 1722, 1728, 530 F. Supp. 2d 1343, 1349 (2007) ("Commerce is bound to reinstate the order if the legal basis for revocation . . . is withdrawn"), quoting that defendant's reply brief at 4 (this court's ellipsis).  Liquidation of the entries "subject to" the section 129 determination, *i.e.*, those made after the effective date of revocation, had been, and could continue to be, enjoined in order to preserve the DSMC's right to relief over those entries pending a final decision in *this* appeal, and therefore "requiring" a challenge to that section 129 determination, simply, *arguendo*, in order to "further" preserve the DSMC's rights with respect those entries impacted by the section 129 determination, was not only inappropriate but would have amounted to a waste of resources.  The court therefore determined to continue that suspension of liquidation, even after the time for challenging the section 129 determination under 19 U.S.C. §1516a(a)(2)(A) & (B)(vii) had passed.  *See* Slip Op. 12-46; *see also* Slip Op. 11-137.  Entries suspended pursuant to litigation are to be liquidated in accordance with the final judgment in this action, *see* 19 U.S.C. §1516a(e), or pursuant to administrative review, *see infra* n.3, and in accordance with that statute, the DSMC averred that to the extent the final decision in this matter is of AD margins that are above *de minimis* and regardless of the absence of zeroing methodology employed in the section 129 recalculation, relevant suspended entries cannot be liquidated in a manner contrary to that final judgment.  To that extent, they were, and are, correct.

upon an affirmative final determination of LTFV sales that Commerce has decided to revoke as a

consequence of its implementation of the section 129 determination results.  Were this matter

ultimately to sustain an affirmative final determination of LTFV sales even in the absence of zeroing

methodology, rescission of that revocation would not (continue to) be the lawful result.  In that

circumstance, if liquidation is permitted to occur between revocation and rescission of revocation,

the DSMC will have been deprived of the full relief to which success in this matter entitles them,

as compelled by the original *status quo* of this matter before Commerce.  Therefore, the current

*status quo* is not "like" the circumstance of an original negative determination of LTFV sales, where

petitioners' precatory motions to a court to enjoin liquidation have been routinely denied.  Or, if it

is, then the situation is similar to petitioners having no immediate equitable right to enjoinder of

liquidation when seeking to change the *status quo* of an original *negative* LTFV investigation and

pursuant to which no AD order has issued, *i.e.*, respondents have no immediate equitable right to

liquidation on the basis of a changed *status quo* occasioned by revocation of an AD order as the

result of a section 129 determination that occurs in the midst of a judicial challenge to the underlying

*affirmative* LTFV investigation and pursuant to which an AD order has issued.  Administrative

revocation pursuant to a section 129 determination in that circumstance can only be regarded as

interlocutory, *i.e.,* provisional, and dependant upon the outcome of this matter, over which the court

has jurisdiction, and the relief sought herein.[3]  *Cf. Advanced Technology & Materials Co., Ltd. v.*

*United States*, 37 CIT ___, Slip Op. 13-129 (Oct. 11, 2013).

---

[3]  The court has become aware that Shinhan recently filed an unopposed motion to modify the injunction so as to permit liquidation as to entries covered by the completed first and second administrative reviews.  The motion will be considered in due course.

## II.  Voluntary Remand for Recalculation of Ehwa's Divisional ISEs

The DSMC contest two aspects of Commerce's treatment during the investigation of Ehwa's reported indirect selling expenses (ISEs).  These are fixed costs that a seller would incur regardless of whether a sale is made; they do not vary with the quantity sold or relate to a particular sale but may reasonably be attributed to such sales through proper cost accounting methodology.[4] *See* 19 C.F.R. §351.412(f)(2).  On the first of its ISE claims, the DSMC point out that early in the investigation Ehwa originally reported that only its Stone & Construction division sells subject merchandise and based its reported ISEs on the expenses and sales of that division.  *See* Issues and Decision Memorandum accompanying *Final Determination* ("*I&D Memo*"), PDoc 529, at cmt. 19. Subsequent to the preliminary results, Commerce issued a scope ruling that certain merchandise sold by Ehwa's Industrial Division, its only other division, was in-scope.  The rationale behind Ehwa's divisional reporting having thus disappeared, the DSMC pointed this out in its case brief and requested that Commerce recalculate and apply Ehwa's ISEs on a company-wide basis.  PDoc 528, CDoc 231, at 74.  Commerce agreed in principle, but declined to make the adjustment at the time

---

[4] Commerce typically allocates ISEs by calculating an ISE ratio derived by dividing the total ISEs (x) by the total sales value (y).  The defendant explains that x and y are linked: if an expense is included in x, then the sales value is included in y, and *vice versa*, and the ISE ratio is multiplied by the price of each sale.  *See, e.g., Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea,* 67 Fed. Reg. 11976, 11979 (Mar. 18, 2002) (final AD review results) and accompanying issues and decision memorandum at cmt. 1.  Commerce thus includes ISEs in its calculations by first dividing the value of a company's ISEs by the total value of the company's sales, and then applying the same ratio to all sales.  Its general practice has been to calculate separate ISEs for each separate company and regardless of whether separate companies are affiliated.  *See, e.g., Carbon and Alloy Steel Wire Rod from Trinidad and Tobago,* 71 Fed. Reg. 65077, 65079 (Nov. 7, 2006) (prelim. AD review results).  Commerce will also accept an intra-company divisional calculation and corresponding application of ISEs where a respondent can show that only certain divisions sold subject merchandise and can accurately segregate those divisions' ISEs from those of divisions not selling subject merchandise.

on the belief that the impact would be negligible.  It now requests remand in order to reconsider, and the DSMC concur.  Ehwa opposes for various reasons, but Commerce's request does not appear to involve a change in or interpretation of policy or frivolousness or bad faith.  *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1027-30 (Fed. Cir. 2001).  The matter will be remanded accordingly.

### III.  Exclusion of Ehwa's Inter-Company ISE's

The second ISE claim concerns sales of some of Ehwa's subject merchandise being transacted through one, two, or sometimes three affiliates before ultimately being transacted to unaffiliated customers.  The DSMC argued for inclusion in the dumping calculation of ISEs incurred at each step of such sale processes.  *See* DSMC Br. at 22-25.  Commerce agreed in the *Final Determination* that separate ISEs should be calculated for Ehwa and each of its selling affiliates, but it declined to "stack expenses associated with transferring merchandise from one affiliate to the next in addition to the expenses that each affiliate experiences when preparing to sell to external customers." *I&D Memo* at cmt. 20.  Commerce reasoned that the inter-company expenses and sales values between Ehwa and its U.S. affiliates are not includable ISEs "because selling expenses are incurred when selling to external customers, not for transfers between affiliates", *id*., and it thus included only ISEs incurred by the entity selling to the first unaffiliated customer in its calculations.

The DSMC contend this was inappropriate and illogical.  They argue that each of Ehwa's U.S. selling affiliates was involved in eventual sales of subject merchandise to unaffiliated customers in the U.S., *see* PDoc 147, CDoc 46, at A-13-14 and Ex. A-6, and that Commerce should capture all of Ehwa's and its affiliates' ISEs that are attributable to sales of subject merchandise. According to the DSMC, this would involve separate calculations of ISE ratios for each affiliate and

having the denominator for each ratio reflect the total sales value for each company, inclusive of

transfer price, not the U.S. sales value net of inter-company sales.

In opposition, the defendant contends Commerce's practice of not deducting expenses

associated with sales made to affiliated customers should be sustained:

> When the ISE ratio is applied to the price of total sales, the resulting ISE that is
> deducted from the CEP represents the portion of the sales that Commerce deems to
> represent the ISE associated with that sale.  If Commerce were to include the affiliate
> transfers in the ISEs (x) and total sales value (y) in the ISE ratio for each selling
> affiliate, Commerce would be including at least a portion of the affiliate-related
> expense in the ISE that is eventually deducted from the CEP[, which] . . . would run
> afoul of Commerce's practice of not deducting expenses related to sales made to
> affiliated importers in the United States.

Def's Resp. at 63.  The defendant's apparent reference point for this contention, in addition to the

*I&D Memo*'s analysis, is *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1313 (Fed. Cir. 2001)

("Commerce logically must deduct only those expenses incurred solely in CEP transactions, *i.e.*, only

those expenses associated with the sale of subject merchandise to an unaffiliated purchaser in the

United States by a party affiliated with the foreign producer or exporter").

The court will defer to administrative policy that is reasonably explained, but the

reasons here, on why intra-transfer costs are not ISEs that are borne by the ultimate customer, appear

*ipse dixit*, and the defendant's explanation of that practice, if it exists, appears circular.  To "incur"

means "[t]o suffer or bring on oneself (a liability or expense)."  *Black's Law Dictionary*, p. 782 (8th

ed. 2004).  The parties' main difference on this point seems philosophical, but the DSMC's argument

has a certain accounting logic behind it, in that an ISE "incurred" with respect to the ultimate

customer is no less "incurred" at each stage of transacting the merchandise, in this instance from

Ehwa through each relevant affiliate to the ultimate purchaser, which the defendant apparently

concedes. *See supra*.   While intra-company transfers do not impact cash flow, there are apparent

associated selling costs that might properly be considered ISEs in accordance with 19 U.S.C.

§1677a(d)(1)(D).   *Cf.* 243 F.3d at 1306 (ISEs include, *e.g.*, rents on sales office space, salespersons'

salaries, and certain inventory carrying costs).   By contrast, the court does not discern a double-

counting concern in Commerce's "stacking" point.   Whether that is indeed the case, the matter needs

clarification before proceeding further and will therefore be remanded for that purpose.   On remand,

Commerce is not precluded from reconsidering the issue anew, as long as it provides a reasonable

explanation therefor.

### IV.  Determination Not To Collapse Ehwa, Shinhan, and Affiliates

Commerce may calculate a single AD rate for producers where (1) they are affiliated,

(2) have production facilities for similar or identical products that would not require substantial

retooling of either facility in order to restructure manufacturing priorities, and (3) there is a

"significant potential" for the manipulation of price or production.  19 C.F.R. §351.401(f).[5]  In the

investigation, Commerce found that Shinhan and Ehwa satisfy the first two criteria: they are

affiliated with each other, and they have production facilities for similar or identical merchandise.

Shinhan is also affiliated with other Korean firms from which it procures inputs.   Ehwa is also

affiliated with certain PRC firms from which it too procures inputs.   For the *Final Determination*,

nonetheless, Ehwa was not collapsed with Shinhan, Shinhan was not collapsed with its Korean

affiliates, and Ehwa was not collapsed with its PRC affiliates.

---

[5] Commerce originally selected "significant potential" as the appropriate standard to address
the problem of prospective manipulation.  *See Antidumping Duties; Countervailing Duties*; 62 Fed.
Reg. 27296, 27345-46 (final rule) (May 19, 1997) ("*Preamble*").

The DSMC's arguments here concern only Commerce's findings and conclusion on the significance of the potential for price or production manipulation. *See* 19 C.F.R. §351.401(f)(1). That significance depends upon a non-exhaustive list of such factors as (1) the level of common ownership, (2) the extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm, and (3) whether operations are intertwined, such as through sharing of sales information, involvement in production and pricing decisions, sharing of facilities or employees, or significant transactions between affiliated producers. 19 C.F.R. §351.401(f)(2). The determination is based upon the totality of the circumstances, not upon any single factor. *See*, *e.g.*, *JTEKT Corp. v. United States*, 33 CIT 1797, 1825, 675 F. Supp. 2d 1206, 1233 (2009).

A. Determination Not to Collapse Ehwa and Shinhan

Commerce preliminarily determined to collapse Ehwa and Shinhan on the ground that "[[                              ]] have the ability and the potential to coordinate their actions in order to direct Ehwa and Shinhan to act in concert with each other, given the management overlap by the companies' senior managers, *i.e.*, [[                              ]] hold senior management positions and board of director positions in Ehwa and Shinhan." Memorandum, re: *Petitioner's Allegation Regarding the Business Relationship Between Two Respondents* (Dec. 20, 2005) (preliminary collapsing memorandum), PDoc 335, CDoc 123, at 7-8.

For the *Final Determination*, Commerce reversed course. In concluding that as between Ehwa and Shinhan there did not exist a significant potential for price and production manipulation, Commerce specifically found as follows: (1) "there are no individuals jointly employed by both Shinhan and Ehwa, or serving as members of each company's board of directors";

 (2) [[                                    ]] are in the minority on each company's board of directors, [[

                                    ]]; (3) "there is no evidence that Ehwa and Shinhan have

shared any employee, let alone a senior manager, for the last 18 years since [[                    ]]

left in 1987"; (5) "there are no persons that sit on the board of directors of both Ehwa and Shinhan,

or are otherwise shared by both companies"; (6) "even though [[

                                    ]], there is no one person or persons

shared by both companies that can effectuate and coordinate the activities of both companies"; (7)

"there are no intertwined operations between Ehwa and Shinhan"; (8) "[d]uring verification, the

Department was unable to identify any business connections between the companies"; (9) "during

verification, [it also] found evidence that Ehwa and Shinan do not cooperate with each other",

specifically (a) there were no transactions between the companies for 10 years; (b) there were no

shared patents; (c) Ehwa had [[                                    ]]; (d) Ehwa and Shinan have

competing overseas offices; and (10) although the CEO of Shinhan owns 18 percent of Ewha, "the

Department verified that he [[

                                    ]]" Memorandum, re: *Collapsing for the Final Determination* at 8-10 (May 15, 2006)

("*FCM*"), PDoc 536, CDoc 241, at 9-10.  Thus, "Ehwa and Shinhan[,] while having substantial

common ownership, do not have the significant potential for price or production manipulation given

the absence of interlocking boards of directors, no shared managers, no intertwined operations, and

evidence of non-cooperation" in the form of [[                                    ]].  *Id*. at 10.  *See I&D Memo* at

cmt. 13.

Despite the foregoing, the DSMC argue that Commerce's decision was not adequately explained and that the record demonstrates a strong potential for manipulation of price and/or production between these parties.  In particular, they point to Commerce's acknowledgment that [[                              ]] sat on the boards of directors of both Ehwa and Shinhan, that [[

                                                                                      ]], and that there is "substantial common ownership."  The DSMC contend there is no evidence on the record to prove a separation of professional and personal interaction between [[                              ]], that Commerce's final "belief" that coordination of activities between the two companies could not be effected through [[

          ]] is insufficiently explained, and that there is no new evidence between the preliminary and final determinations to justify the opposite conclusion that collapse was not warranted.  *E.g.*, DSMC Reply at 2-3, referencing Def's Resp. at 17 & PDoc 515, CDoc 217, at 22-32.  The DSMC also contend Commerce's practice as it existed in 2006 supported collapsing companies even in the absence of intertwined operations so long as there was common control and overlapping boards.

These arguments are insufficient to undermine the substantiality of the evidence of record in support of Commerce's determination.  Apart from the fact that the cases to which the DSMC refer[6] post-date the investigation at bar, even if Commerce's practice in 2006 existed as contended it could not be construed as a *per se* rule, since Commerce specifically rejected that

---

[6] *See* DSMC Br. at 9-10, referencing *Chlorinated Isocyanurates from the People's Republic of China*, 74 Fed. Reg. 68575 (Dec. 28, 2009) (final AD new shipper review results); *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 74 Fed. Reg. 11349 (Mar. 17, 2009) (final AD admin. and new shipper reviews)

approach when it adopted 19 C.F.R. §351.401(f).[7]  And regarding the absence of new facts between

the preliminary and final determinations, that circumstance does not, without more, render the latter

decision unreasonable on its own, since, by definition, a preliminary determination is without the

force of law.  *See, e.g.*, *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644

(2007); *NEC Corp. v. United States*, 151 F.3d 1361, 1374 (Fed. Cir. 1998); *Southwest Center for

Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515 (9th Cir. 1998) ("*SCBD*").  The

only relevant question for the court is whether substantial record evidence supports the final

conclusion that there was no potential for price or production manipulation based on the totality of

the evidence.  *Cf. SCBD*, 143 F.3d at 523.

On a more precise tack, the DSMC also stress that Commerce failed to address a

report alleging that the president of Ehwa "created a sales subsidiary in the United States under his

wife['s] name[,] . . . began exporting product to the United States at a 10 percent discounted price,

. . . [and] misappropriated the additional profit of $2.55 million and the U.S. subsidiary's sales profit,

for a total of $4.37 million", and that "evidence of a previous criminal scheme involving price

manipulation was clearly relevant to the question of whether there was a significant potential for the

manipulation of price".  They also mention that both Ehwa and Shinhan in their Section A

questionnaires [[

]].  *See* DSMC 56.2 Br. at 9-13, referencing Petitioners' letter

---

[7]  *See Preamble*, 62 Fed. Reg. at 27345-46 (any finding of potential for price manipulation would lead to collapsing in almost all circumstances in which producers are affiliated, which "is neither the Department's current nor intended practice"; collapsing "requires a finding of more than mere affiliation").  Commerce also refused to include examples because collapsing is "very much fact-specific in nature, requiring a case-by-case analysis".  *Id.* at 27246.

to Commerce dated December 6, 2005, re: *Collapsing of Shinhan and Ehwa*; DSMC Reply at 4; *see also* DSMC Collapse Request, PDoc 293, CDoc 106, at 2.

Ehwa contends it provided rebuttal to Commerce to show that Ehwa's president was never arrested nor charged with any criminal scheme involving price manipulation but was instead charged with failing to report to the Korean Ministry of Finance his purchase and ownership of real estate in the United States, for which penalties were suspended upon the presumption that he had been unaware of his reporting requirement as a permanent resident of the United States.  Ehwa also contends Commerce verified the evidence it provided to contradict the claim of [[

]].  *See* Ehwa Resp. at 14-15; CDoc 202 at 5-6, referencing Ex. 4 at 30A-30B thereto.  The defendant adds that Commerce considered the relevancy of the arrest allegation "unclear" to the collapsing analysis, that Commerce can pick and chose which factors are relevant and make factual findings as to those factors, and that an explanation is not required in instances "where the agency's decisional path is reasonably discernible."  Def's Resp. at 24, referencing, *inter alia*, *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966), *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998), and *JTEKT*, *supra*, 33 CIT at 1826, 675 F. Supp. 2d at 1234.  The defendant and Ehwa both argue that Commerce examined the issues thoroughly,[8] and that in the final analysis Commerce's conclusion not to collapse Ehwa and Shinhan was reasonable because a party cannot be required to provide indisputable proof of a negative, *i.e.*, of a lack of professional

---

[8]  *See* Shinhan Cost Verification Report, CR 193; Ehwa Cost Verification Report, CR 194; Shinhan Home Market and Export Price Sales Verification Report, CR 198. Shinhan CEP Sales Verification Report, CR 199; Ehwa CEP Sales Verification Report, CR 201; Ehwa Home Market and Export Price Sales Verification Report, CR 202.

and personal interaction between [[                                  ]].  *See Allied Tube*, 24 CIT at 1374-75,

127 F. Supp. 2d at 222-23.

The absence of evidence is not evidence of absence,[9] of course, *cf. id.*, but Commerce

is duty-bound to consider the available evidence on the level of common ownership and the extent

to which there are shared board members.  *See, e.g.*, *JTEKT*, 33 CIT at 1826-27, 675 F. Supp. 2d at

1234.  The court cannot substitute its own judgment on such matters but can only review on the basis

of substantial evidence on the record or for abuse of discretion.  At the same time, however, the

agency's explanation of its decision must be clear enough to enable judicial review, and cannot

"leave vital questions, raised by comments which are of cogent materiality, completely unanswered."

*United States v. Nova Scotia Food Prods.*, 568 F.2d 240, 252 (2d Cir. 1977).[10]

The material issue here is the potential for price or production manipulation.  From

the fact that Commerce did not discuss the DSMC's evidence or arguments with respect to the arrest

and [[         ]] allegations of record in the *I&D Memo* or in the final collapsing memorandum for

Ehwa and Shinhan, it may be inferred that Commerce determined that the DSMC's evidence was

insignificant, immaterial, or not seriously undermining enough to merit discussion.  In that regard,

the DSMC do not persuade that Commerce's determination on the evidence of record before it was

---

[9]  *See, e.g.*, *Porter v. Secretary of Health and Human Services*, 663 F.3d 1242, 1264 (Fed. Cir. 2011), parenthetically quoting *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 436 (6th Cir. 2009) (Boggs, C.J., dissenting).

[10]  According to the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, Pub. L. No. 103-465, H. Doc. 103-316, vol. VI (1994) ("*SAA*"), at 892, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4215, "[e]xisting law does not require that an agency make an explicit response to every argument made by every party, but instead requires that issues material to the agency's determination be discussed so that the path of the agency may reasonably be discerned by the reviewing court" (internal citations omitted).

unreasonable.  *See Altx, Inc. v. United States*, 370 F.3d 1108, 1113 (Fed. Cir. 2004) (an agency must "address significant arguments and evidence which seriously undermines its reasoning and conclusion" but "need not address every argument and piece of evidence").  More broadly, the DSMC do not persuade that Commerce's determination not to collapse Ehwa and Shinhan was unreasonable at the time.  Although Ehwa and Shinhan are not only affiliated but [[

                                        ]], Commerce essentially concluded that the other evidence of record showed the two to be competitive, not cooperative or potentially cooperative.  The court cannot re-weigh the evidence in support thereof and substitute judgment therefor.

B.  Determination Not to Collapse Shinhan with its Korean Affiliates

        The threshold question in a collapsing inquiry is whether the affiliate is a producer of the subject merchandise or the foreign like product.  *See* 19 C.F.R. §351.401(f)(1).  Commerce determined not to collapse Shinhan and three of its Korean affiliates, Technoplus Co., Ltd. ("TPC"), Namdong Tools ("Namdong"), and INCOM, "because TPC, INCOM, and Namdong have not been demonstrated to be producers of either subject merchandise or the foreign like product".  Shinhan Collapsing Memo, PDoc 235, CDoc 242, at 5.  More precisely, Commerce observed that the "petitioner notes that TPC [[

        ]] and that INCOM provided Shinhan, through TPC, [[                        ]]" and it found that a review of the scope language evidenced that "[[                        ]] are neither subject merchandise [n]or the foreign like product"; therefore, Commerce found that neither TPC nor INCOM were producers as required by the regulation.  Shinhan Collapsing Memo, PDoc 235, CDoc 242, at 4-5.  Commerce thus found no record evidence to demonstrate that during

the POI either Namdong or INCOM have production facilities for producing subject merchandise or foreign like or similar products that would not require substantial retooling in order to restructure manufacturing priorities, and it rejected the DSMC's argument that the likelihood that they possessed such facilities should be assumed. *See id*. Commerce further found that TPC's facility had not been used before the POI to make subject merchandise or foreign like product, and from the fact that Shinhan had [[                                    ]] during the POI Commerce concluded that TPC did not "make use" of the production facility during the POI. *Id.*

The DSMC contest those determinations, but they do not appear to be unreasonable. They argue that the fact that TPC [[                                    ]] in no way demonstrates or supports finding that TPC did not make use of the facility during the POI, that there is no other evidence of record to support the assertion, and that the very fact that [[

                                    ]] demonstrates that TPC met the second requirement for collapse, *i.e.*, that it "has" a facility that would not require substantial retooling in order to produce subject merchandise or foreign like product. The argument overlooks the standard of judicial review, however. The collapsing regulation does not delimit the extent to which producers "have" the necessary facilities to qualify under the regulation. Possession being nine-tenths of the law, the court is unable to find Commerce's interpretation of its regulation in this instance unreasonable.

The DSMC also contend Commerce points to no evidence supporting its finding that Namdong and INCOM were not producers of subject merchandise. That, however, does not accurately characterize the standard for satisfying the particular collapsing criterion, *see Allied Tube*, *supra* (re: proof of a negative), or the reviewing standard here. The administrative determination is

based on a lack of evidence on the record that these affiliates produced subject merchandise.

Commerce's finding with respect to INCOM is based upon the DSMC's own description of

INCOM's production.  PDoc 235, CDoc 242, at 5.   With respect to Namdong, Commerce found no

record to demonstrate that the goods it produces were in fact subject merchandise or foreign like

product, *id.*, and Commerce verified that all the transactions on Namdong's domestic sales ledger

for fiscal year 2004 were for tolling services for Shinhan.  *Id.*  Reasonable minds may differ over the

same set of facts, but it appears Commerce investigated the issue and reasonably construed the

available record in making its finding.  The court, once again, cannot substitute judgment on the

matter even were it to agree with the DSMC on the issue.  *See Consolo*, *supra*, 383 U.S. at 620.

### C.  Determination Not to Collapse Ehwa with Certain PRC Affiliates

Weihai Xingguang Mechanical Ind. Co., Ltd. ("Weihai") and Fujian Ehwa Diamond

Industries ("Fujian") are Ehwa's [[                    ]] PRC affiliates.  They provided inputs used in the

production of Ehwa's subject merchandise in Korea.  Weihai and Fujian both produced [[

]], and Ehwa reported [[

]] from both of these affiliates.  The operations

of all these entities were intertwined by significant [[                                    ]] arrangements

between them.  *See* PDoc 528, CDoc 231, at 64-65; Ehwa's Sec. A QR (Aug. 26, 2005), PDoc 147,

CDoc 46, at A-4, A-7 & Ex. A-4; Ehwa's Supp. Sec. A QR (Sep. 29, 2005), PDoc 185, CDoc 56,

at SA-6.  For the *Final Determination*, Commerce concluded that the AD statute precludes it from

collapsing producers across country lines, and it therefore determined not to collapse Ehwa with its

PRC affiliates.  *See I&D Memo* at cmt. 15, referencing *Stainless Steel Bar from Italy*, 67 Fed. Reg.

3155 (Jan. 23, 2002) (final LTFV determ.), and accompanying issues & decision memorandum at

cmt. 8.  *See Slater Steels Corp. v. United States*, 27 CIT 1786, 297 F. Supp. 2d 1362 (2003).[11]

       The DSMC argue that but for Commerce's conclusion that it is statutorily precluded

from collapsing across country lines, Ehwa and its PRC affiliates would meet that test, since

Commerce's regulation asks, among other considerations, whether there is "involvement in

production and pricing decisions, the sharing of facilities or employees, or significant transactions

between the affiliated producers" 19 C.F.R. §351.401(f)(2)(iii).  The DSMC point out that the

definition of "affiliated persons" in 19 U.S.C. §1677(33) is not limited to any type of geographical

location and that Commerce's collapsing regulation only asks whether those affiliates "have

production facilities for similar or identical products that would not require substantial retooling of

---

       [11] Commerce's reasoning in *Slater Steels*, as restated and sustained by the court at the time, may be reduced to the following: the definition of "normal value" in 19 U.S.C. §1677b(a)(1)(B) is the price of "foreign like product" sales in the home market, in a third country, or constructed value, and the definition of "foreign like product" under 19 U.S.C. §1677(16) is identical or similar merchandise that is "produced" in the "same country" as the subject merchandise; *ergo*, Commerce can only analyze for purposes of collapsing that production that occurs in the same country as the foreign like product or the subject merchandise -- and notwithstanding any cross-border production line.  *See* 27 CIT at 1788, 297 F. Supp. 2d at 1364-65. Commerce also gleaned support from the definition of "country" in 19 U.S.C. §1677(3), which does not permit more than one country from being aggregated and treated as an "association" for purposes of AD proceedings. *See id*.; *see also* 19 U.S.C. 1677(12) ("attribution of merchandise to country of manufacture or production": "[f]or purposes of part I of this subtitle, merchandise shall be treated as the product of the country in which it was manufactured or produced without regard to whether it is imported directly from that country and without regard to whether it is imported in the same condition as when exported from that country or in a changed condition by reason of remanufacture or otherwise").  Commerce emphasized for the *Final Determination* that its regulation makes "clear" that collapsing is relevant to "an antidumping proceeding," which "only involves the subject merchandise of one country", *I&D Memo* at cmt. 15, referencing 19 C.F.R. §351.401(f), and it further stated that when it has used information from two companies to calculate a single weighted-average margin for those companies, it has done so only within the confines of "single proceeding, which involved a single country", *id*., referencing *Gray Portland Cement and Clinker From Mexico*, 66 Fed. Reg. 14889 (Mar. 14, 2001) (final AD admin. rev. results).

either facility in order to restructure manufacturing priorities and the Secretary concludes that there

is a significant potential for the manipulation of price or production."  19 C.F.R. §351.401(f)(1).

They also point out that Congress specifically provided for cross-border analysis in several instances

such as the "special rule for multinational corporations," which requires, when certain conditions

are met, normal value to be determined by reference to the value at which the foreign like product

is sold from one or more facilities outside the exporting country. 19 U.S.C. §1677b(d).[12]

        It is undisputed that this was a "single proceeding" to determine the viability of an

AD order on subject merchandise from a "single country" and that the merchandise that is the subject

of the investigation consists, at least in relevant part, of Ehwa-exported products of Korea comprised

of inputs manufactured by Weihai and Fujian and transferred to Ehwa.  The DSMC are correct in

pointing out that the AD statute does contemplate cross border analysis in certain situations, and that

*Slater Steels* does not amount to a blanket prohibition against such analysis in every instance, *see*

---

        [12] Ehwa argued before Commerce that section 1677b(d) was "inapposite" to the facts of this
case because that provision pertains to situations where normal value is determined by being based,
in part, on sales in a third country, whereas the *Final Determination* is based entirely on a normal
value of home market sales. The *Final Determination* does not rest on such ground, but that may
well be the case, as there are three criteria that must be met before section 1677b(d) is invoked: (1)
subject merchandise exported to the United States is being produced in facilities which are owned
or controlled, directly or indirectly, by a person, firm, or corporation which also owns or controls,
directly or indirectly, other facilities for the production of the foreign like product which are located
in one or more third countries; (2) the market in the country from which the merchandise is exported
to the United States is "not viable" because either (a) the foreign like product is not sold for
consumption in the exporting country; (b) the aggregate quantity (or value) of the foreign like
product sold in the exporting country is insufficient to permit a proper comparison with the sales of
the subject merchandise to the United States; or (c) the particular market situation in the exporting
country does not permit a proper comparison with the export price or constructed export price; and
(3) the normal value of the foreign like product produced in one or more of the facilities outside the
exporting country is higher than the normal value of the foreign like product produced in the
facilities located in the exporting country.  *See* 19 U.S.C. §1677b(d).

27 CIT at 1788, 297 F. Supp. 2d at 1364 ("[e]*xcept for* specific enumerated exceptions to the rule, consolidating . . . data across country lines for [AD] investigations is prohibited")[13] (italics added), but the fact that cross-border analysis is required in certain instances does not render Commerce's broad interpretation of preclusion from "collapsing" "producers" across country lines unreasonable, and the DSMC's arguments do not persuade that calculating a single weighted-average margin that would include Ehwa's PRC affiliates within the ambit of the order pursuant to Commerce's collapsing methodology would be permissible under the AD statute.  The DSMC's concerns implicate the whole of the production line, including one that cuts across country borders, but a degree of protection from manipulation of "production" (as Commerce interprets that term) may be afforded in the forms of the anti-circumvention statute, 19 U.S.C. §1677j, as well as the present AD order on diamond sawblades and parts thereof from the PRC from that separate proceeding.

---

[13]  It has been observed that the most "vital" consideration to preserving the integrity of AD orders is the determination of the "country of origin" of "production", not only of subject merchandise but also of the foreign like product.  *See E.I. Du Pont de Nemours & Co. v. United States*, 22 CIT 370, 375, 8 F. Supp. 2d 834, 859 (1998).  In those determinations, the necessity of cross-border analysis is readily apparent in other contexts.  For example, the anti-circumvention statute specifically precludes completion or assembly operations -- which are indisputably a part of "production" -- from attaching a different country of origin to subject merchandise.  19 U.S.C. §1677j.  Congress has also recognized a state of subject merchandise "exportation from an intermediate country" in which production of foreign like product is also occurring.  In that instance, subject to certain exceptions, normal value is to be determined "in" such intermediate country based on that foreign like product.  19 U.S.C. §1677b(a)(3).  Thus, under such analyses, the foreign like product that is used for the determination of normal value is not considered "produced" in the "same country" as that in which the subject merchandise has actually been produced -- as otherwise "required" by 19 U.S.C. §1677(16).  *And cf.* 19 U.S.C. §1677b(d) (special rule for multinational corporations).  In other words, the analyses required by the "exceptions" to which *Slater Steels* alludes can only be achieved without violating the "produced in the same country" mandate of section 1677(16)(A) via cross-border analyses.  But, that, perhaps, is merely to restate the obvious.

### D.  Incidental Issues Implicated By Collapsing

In addition to the foregoing, the DSMC contest the effect of the determination not to collapse Ehwa and Shinhan upon the calculation of separate constructed export price (CEP) offsets and CONNUMs sold but not produced during the POI that were not weight-averaged.  These issues being derivative, the foregoing obviates their further consideration.

### V.  Country of Origin for Finished Diamond Sawblades

Commerce typically uses a three-part "substantial transformation" test to determine a product's country of origin: (1) whether the processed downstream product falls into a different class or kind of product when compared to the upstream product, (2) whether the essential component of the merchandise is substantially transformed in the country of exportation, and (3) the extent of processing in the exporting country.  *See I&D Memo* at cmt. 3; *see, e.g., Advanced Technologies & Materials Co. v. United States*, 35 CIT __, Slip Op. 11-122 (Oct. 12, 2011) ("*Advanced Tech II*"), at 8. In this instance, Commerce ultimately determined that the place where the segments and cores are joined governs the finished diamond sawblades' country of origin.

The DSMC argue this result is an invitation for circumvention.  They contend the first of the above factors clearly supports finding a lack of substantial transformation, in that cores, segments and sawblades were all considered the same "class or kind" of merchandise, *see* Def.'s Br. at 54, and that Commerce has failed to explain how it could logically make that determination and also find that joining two of those items into the third constitutes a "substantial transformation."

The court again cannot agree Commerce's reasoning was illogical or unsupported by substantial evidence.  As in the investigation of subject merchandise from the PRC, Commerce had

to make a choice, and it resolved the factual issues by reference to *Erasable Programmable Read Only Memories (EPROMs) From Japan*, 51 Fed. Reg. 39680 (Oct. 30, 1986) (final LTFV determ.) and *3.5″ Microdisks and Coated Media Thereof From Japan*, 54 Fed. Reg. 6433 (Feb. 10, 1989) (final LTFV determ.) ("*Microdisks*").  Commerce found the fact that finished diamond sawblades, segments and cores are all one "class or kind" not dispositive because substantial transformation can occur between upstream and downstream products within the same class or kind of merchandise under investigation.  Commerce concluded that the substantial transformation test in such instances is not controlled by whether there is a "change" in the class or kind of merchandise but by what the "essential quality" is that is imparted to the imported merchandise through such transformation, as well as the extent of manufacturing and processing.  The DSMC argued that the diamond segments are what give a finished diamond sawblade its essential character, but Commerce concluded

> it appears that neither the cores nor the segments *alone* constitute the essential component of the product under investigation.  A finished DSB is not *functional* until the segments are attached to the core . . . [and i]t is apparent that even the petitioner recognizes the importance of the attachment process in imparting the essential quality of the finished product.  Therefore, given the priority that both the petitioner and a respondent have placed on the importance of attaching cores and segments, the Department finds that the essential quality of the product is not imparted until the cores and segments are attached to create a finished DSB.

*I&D Memo* at cmt 3 (italics added).

The DSMC here contend Commerce never explained what qualities or quality it deemed essential in this instance.  If that is technically true, it is not fatal to the agency's determination.  Commerce could not tell whether segments or cores impart the "essential quality" of a finished diamond sawblade, but it found that the attachment process governs when that essential quality -- whatever it is -- comes into being, *i.e.*, when the functional finished product is created.

The DSMC regard "essential quality" as extant in the diamond segments, not the cores.  That may

be true, but Commerce regarded "essential quality" as a function of the "finished" product.  The

DSMC contend this "finding" has the potential to "turn[ ] the entire concept of 'substantial'

transformation on its head", DSMC Br. at 38 n.9, referencing *National Hand Tool Corp. v. United

States*, 16 CIT 308 (1992), *aff'd*, 989 F.2d 1201 (Fed. Cir. 1993) (finding that finishing operations

applied to hand tool forgings did not substantially transform the forgings, as the forgings were in the

basic shape of the finished tool, and thus could not have been processed except into finished tools),

but that is not this case.  Although the court can aid resolution of esoteric factual disagreements, it

has not been so tasked in the AD context, *see* 19 U.S.C. §1516a(b)(l)(B)(i), and cannot weigh in.

        In accordance with *EPROMs* and *Microdisks*, Commerce also considered the extent

of processing and found that both segment manufacturing and the attachment process required

"substantial capital investment[s] and great technical expertise."  *I&D Memo* at cmt 3.  Commerce

determined that this finding did not alter its conclusion that the country of origin is determined by

the location where segments and cores are attached to create a finished product.  The DSMC would

here juxtapose the record of production costs for segments, which it argues typically represent

approximately [[                                                          ]], against the process of joining segments

to the blade, which is typically a  much  smaller percentage of production cost (as low as [[

]]), *see* CDoc 157, PDoc 412 at 8 & Exhibit 1; CDoc 231, PDoc 528 at 46, to argue that the

agency has not adequately explained how finding that both segment processing and core-segment-

attachment processing require substantial capital investments and technical expertise supports its

country of origin determination, especially when considered in conjunction with the "same class or

kind" of merchandise factor of the substantial transformation test, but Commerce appears to have

considered this production cost point, as well as the numbers of workers employed in both processes,

in "continu[ing] to find that the country of origin is determined by the location where segments and

cores are attached to create finished DSB." *I&D Memo* at cmt 3. In the final analysis, Commerce

reached a country-of-origin conclusion that accorded with both parties' arguments on the "priority"

of the attachment process in the making of a finished diamond sawblade. Here again, the court

cannot re-weigh the evidence and substitute judgment on these issues for that of Commerce.

## VI. Section E Questionnaire Exemptions

Commerce sends out "Section E questionnaires" to request information pertaining

to respondents' value added in the United States via further manufacturing or assembly of subject

merchandise prior to delivery to unaffiliated United States customers. *See Antidumping Manual*, Ch.

4, §III.A.5. (Dep't Comm. 2009); *see, e.g., Kawasaki Steel Corp. v. United States,* 24 CIT 684, 686,

110 F. Supp. 2d 1029, 1031-32 (2000). A respondent may obtain an exemption from Section E

questioning if it persuades Commerce that its United States sales of further manufactured subject

merchandise constitute a small percentage (typically less than 5 percent) of its overall United States

sales. *See, e.g., Certain Cold-Rolled Carbon Steel Flat Products From Belgium*, 67 Fed. Reg. 62130

(Oct. 3, 2002) (final LTFV determ.) and accompanying issues and decision memorandum (Sep. 23,

2002) at cmt. 1. Ehwa and Shinhan reported further manufacturing operations in the United States

and requested Section E exemption after claiming such sales constituted a small percentage of total

sales. DSMC's opposition to such exemption was unavailing, and Commerce issued no Section E

questionnaires to them.

A.  Exhaustion

The  DSMC's  objections  before  Commerce  are  in  the  form  of  several  filed

submissions.  CDoc 50, PDoc 157 (Sep 7, 2005); PDoc 164, CDoc 53 (Sep. 9, 2005); PDoc 213,

CDoc 71.  These argue that Section E questionnaires were necessary prior to the case briefing stage

of the investigation, but Commerce either rejected or ignored the DSMC's objections.  The DSMC

then  raised  claims  in  its  administrative  case  brief  arising  from  the  non-issuance  of  Section  E

questionnaires, namely the impact this had on adjustments to United States net price and CEP profit

to reflect further manufacturing costs.  *See*, *e.g.*, PDoc 528, CDoc 231, at 35 ("under the statute,

Commerce *must* require respondents to place all necessary information on the record in order to

calculate 'Total Expenses' including further manufacturing expenses") (DSMC's emphasis).

Commerce and the defendant-intervenors here argue that the DSMC failed to exhaust

their administrative remedies over the issue of Section E questionnaires issuance.  *See United States*

*v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37 (1952).  The DSMC respond that they did indeed pursue

those claims, albeit in the context of claims that arose as a necessary consequence of Section E

questionnaire non-issuance, and that the issue thus remained "live" in their administrative brief.

The court will require the exhaustion "where appropriate," 28 U.S.C. §2637(d), which

is generally regarded as a "strict" requirement.  *See*, *e.g.*, *Corus Staal BV v. United States*, 502 F.3d

1370, 1379  (Fed. Cir. 2007).  In light of the current *status quo*, the court can agree with the

defendant to the extent that the DSMC would have better served its cause had it more directly and

forcefully described their objection in their administrative case brief, but this is not an instance where

a party did not even attempt to raise its argument before the agency.  *Cf. L.A. Tucker Truck Lines*,

344 U.S. at 35 ("Appellee did not offer . . . any excuse for its failure to raise the objection upon at

least one of its many opportunities during the administrative proceeding"); *Corus Staal*, 502 F.3d

at 1378 ("Corus acknowledges that it failed to raise any issue relating to the duty absorption issue

in the [administrative] case brief"); *Budd Co., Wheel & Brake Div. v. United States*, 15 CIT 446, 453

(1991) ("[r]elying on the futility exception as a defense, Plaintiff nonetheless conceded at oral

argument that Commerce never refused to hear its contentions").  Commerce's immoveable stance

on the DSMC's repeated objections to the Section E questionnaire exemptions is apparent from the

record, and exhaustion does not require Sisyphean repetition or exactitude in wording in order that

an objection be noted and preserved.  *Cf.*, *e.g.*, *L.A. Tucker Truck Lines*, 344 U.S. at 35; *Corus Staal*,

502 F.3d at 1379; *Budd Co.*, 15 CIT at 453.

An argument satisfies the exhaustion requirement "if it alerts the agency to the

argument with reasonable clarity and avails the agency with an opportunity to address it." *Luoyang*

*Bearing Corp. v. United States*, 28 CIT 733, 761, 347 F. Supp. 2d 1326, 1352 (2004), citing, *inter*

*alia*, *Hormel v. Helvering*, 312 U.S. 552 (1941).  Here, the DSMC did not "abandon" their objection

in their administrative brief, it is implicit in their argument that all U.S. further manufacturing cost

information must be placed on the record in order to accurately adjust U.S. net price and CEP profit.

*See infra*, section VII.  Therein couched, their brief presented "all arguments that continue[d] in the

submitter's view to be relevant to the Secretary's final determination or final results" and "includ[ed]

any arguments presented before the date of publication of the preliminary determination or

preliminary results".   *See* 19 C.F.R. §351.309(c)(2).  Since the record adequately reflects the

DSMC's attempt to rectify Commerce's stance on Section E questionnaires issuance, the underlying

record is adequate for judicial review.

## B.  Merits

Commerce indicated during the original investigation that "if we issue an [AD] order in this case, we expect to examine these issues during the first administrative review conducted in this proceeding if sales are made under these same conditions."  *E.g.*, PDoc 199, CDoc 64, at 2.  The DSMC interpret this as follows:

> When the exemptions were granted, the Department merely postponed examination of this issue to the first administrative review.  Ehwa Exemption, PR 199, CR 64, at 2; Shinhan Exemption, PR 200, at 2.  In so doing, the Department seems to have acknowledged the appropriateness of examining the respondents' further manufactured sales, but for unarticulated reasons, chose not to conduct the examination at that time.  Although the DSMC repeatedly objected to the exemptions, there was, arguably, no real harm to the DSMC *at that time*, in light of what w[ere] likely to be substantial dumping margins.  Now, however, the *status quo* has changed.  The margins at issue are now *de minimis*, and failure to raise them above *de minimis* in this appeal will result in liquidation of relevant entries without duties, . . . a prospect that would cause irreparable harm to the domestic diamond sawblades industry.  Therefore, to the extent that the Department's failure to conduct a full and appropriate original investigation is now contributing to serious prejudice to one of the parties, including the potential revocation of the [AD] order, the DSMC respectfully submits that equity counsels in favor of remanding this decision for reconsideration.

DSMC 56.2 Br. at 19-20 (citations omitted in part, italics in original).

In their reply brief, the DSMC argue that an agency decision may be deemed "unreasonable" if the decision has "entirely failed to consider an important aspect of the problem".  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  They argue the lack of Section E questionnaires from respondents was unreasonable because Commerce relied only on Ehwa's and Shinhan's representations that further manufactured sales comprised only a small volume of U.S. sales.  *See* PDoc 199, CDoc 64, at 1-2; PDoc 200 at 2.  The

DSMC argue that when sales value is taken into account, the record shows otherwise.[14]  DSMC 56.2

Br. at 18, referencing PDoc 213, CDoc 71, at 2.

"Full" and "appropriate" (*see* above) are not synonymous, and the court interprets

Commerce's statement not as an admission of error in not issuing Section E questionnaires but rather

in light of the strict time constraints imposed on the investigation.  *See, e.g.*, 19 C.F.R., Part 351,

Annex III (2005).  The administrative expedient of disregarding U.S.-affiliate sales amounting to less

than five percent is arguably authorized by statute, *cf.* 19 U.S.C. §1677a(e) (requiring at least "a

sufficient quantity of sales to provide a reasonable basis for comparison"), and was at least based

upon the respondents' representations at the time, but with time Commerce's unexplained reaction

to the DSMC's objection has taken on new life.  At this point, front and center perhaps, the effect

of the Section E questionnaire exemptions, and the consequent *ipso facto* absence of further

manufacturing cost information (*see infra*, section VII), may very well be case determinative in light

of the administrative decision to revoke the AD order as a result of the section 129 determination

requiring recalculation of the margins without zeroing methodology.  *See supra*, section I; *see also*

36 CIT ___, Slip Op. 12-46 (Mar. 29, 2012).  Ehwa argues that is beside the point, since it raised the

zeroing methodology issue in its administrative case brief, and the DSMC were on notice

> from the outset that the Department ultimately would conclude that Ehwa was
> entitled to a *de minimis* margin in this investigation, [and therefore] the 'harm' to
> Petitioner arising from the Department's other subsidiary conclusions in 2006 (*e.g.*,
> failure to require that Ehwa complete a Section E response) was no different from the

---

[14]   One of the respondents reported a percentage derived by dividing the total value of segment exports by the total of U.S. sales of Korea-origin products plus Korean origin segments. The DSMC argued that this figure understates, and that a significantly higher percentage appears if based on the total sales value of U.S. manufactured finished products divided by the total U.S. sales of Korea-origin products plus the sales value of U.S. manufactured finished products.

harm today.  This being the case, there has been no change in the *status quo* and no reason for this Court to consider equitable claims.

Ehwa Resp. at 22-23.

The *I&D Memo*, however, ultimately dismissed the zeroing argument as "premature," since the URAA section 123 determination to which Ehwa alludes (*see infra* section XI) had yet to reach finality, and thus the argument above is a stretch as to notice of what "would" be the *status quo* at this point.  If the *status quo* had truly remained unchanged, the court might come to a different conclusion, but it has now been altered, Commerce is now less constrained by statutory time limits, and Commerce did express expectation that the issue of Section E questionnaire issuance would be revisited in the future.  Shinhan contends there is no need, because the exemptions were granted through calculation of the relevant percentage based solely on volume figures and in accordance with Commerce's longstanding practice,[15] but even if that is so, the *Final Determination* does not address the DSMC's argument that Commerce's prior Section E practice should not be construed as applicable on a record of allegedly "substantial" further-manufacturing-added value to the merchandise, which the DSCM contends is the case here, *see* CDoc 64, PDoc 199 at 1-2; PDoc 200 at 2, as well as the DSMC's allegation of an understated percentage of Ehwa's further manufactured sales that were based on [[

]], *see id.*, as well as the DSMC's argument on the fact that

---

[15]   *See* Shinhan's Resp. at 25.  *Cf. Pure Magnesium from the Russian Federation*, 66 Fed. Reg. 49347 (Sep. 27, 2001) (final LTFV determ.) and accompanying issues and decision memorandum (Sep. 14, 2001) at cmt 10; *Hot Rolled Flat Rolled Carbon Quality Steel Products from Japan*, 64 Fed. Reg. 8291, 8295 (Feb. 19, 1999) (prelim. LTFV determ.); *Coated Groundwood Paper from Finland*, 56 Fed. Reg. 56363, 56365, 56371 (Nov. 4, 1991) (final LTFV determ.); *Sweaters Wholly or in Chief Weight of Man-Made Fiber From Taiwan*, 55 Fed. Reg. 34585, 34588, 34597 (Aug. 23, 1990) (final LTFV determ.).

the respondents argued before the U.S. International Trade Commission that their U.S. further manufacturing were of such significance that they should be considered part of the domestic industry, *see generally* PDoc 260, CDoc 88. Commerce's full consideration of these objections is necessary in order to reach a final and just decision on this matter, and the determination not to issue Section E questionnaires will therefore be remanded to address the DSMC's concerns.

In addition, because Commerce has requested remand in order to consider aspects of Ehwa's ISEs that apparently entails additional fact finding, and because soliciting and analyzing responses to a request for Section E information would not appear to add onerous hardship to the parties' burdens, and also since "the basic purpose of the statute [is] determining . . . margins as accurately as possible," *see Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990), Commerce is not precluded from soliciting Section E responses upon remand. For the analysis, Commerce is also requested to explain its alleged policy of exempting Section E questionnaire responses based on a respondent's claim of sales *volume*, when Section E questionnaires are purportedly for the purpose of eliciting information about further manufacturing or assembly *value* added in the United States.

VII.  Adjustments to U.S. Net Price and CEP Profit

The decision not to solicit Section E questionnaire responses from Ehwa and Shinhan impacts the deduction of "further manufacturing costs" from Commerce's constructed export price ("CEP") and CEP profit calculations for them. *See I&D Memo* at cmt. 5 (*i.e.*, on the basis that Ehwa and Shinhan were "excused . . . from reporting their further manufactured sales"). Commerce took the position that "implicit" in the additional statutory adjustments to CEP provided in 19 U.S.C.

§1677a(d)(2) is that the "further manufacturing costs to be deducted actually [have been] incurred with respect to the particular transaction providing the basis for the CEP starting price." *Id*.  As above indicated, the fact that Section E questionnaire responses were not solicited is used as cover for the fact that further manufacturing cost information that may "actually" have been incurred is not on the record.  The DSMC contend that section 1677a(d)(2) is unambiguous in directing Commerce to reduce "the price used to establish" CEP by "the cost of *any* further manufacture or assembly (including additional material and labor)" (italics added).  *Micron*, *supra,* "agree[s] that the word 'any' necessarily includes 'all'. . .", 243 F.3d at 1308, but the issue of Section E questionnaire non-issuance, implicating this issue, is being remanded, above, and the court will defer to Commerce's reasonable interpretation of statute and regulation.  *Cf*. 243 F.3d at 1308 (". . . the real question here is 'all of what'"?) *with Antidumping Manual*, Ch. 7, §III.C.3.a ("[a]s a rule of thumb, if the expense is incurred in the United States by the affiliated importer or the exporter, it should be deducted").

VIII.  Non-Application of the Major Input Rule

The DSMC also contend Commerce erred in not fully addressing its arguments or validly explaining its determination not to apply the "major input rule," 19 U.S.C. §1677b(f)(3), to Ehwa's and Shinhan's purchases from affiliated suppliers.  The "rule" is that if the production of subject merchandise involves transaction of a "major" input from one affiliate to another and Commerce has "reasonable grounds to believe or suspect" that the amount reported as the value of the input is below the cost of production, Commerce may calculate the value of the input on the basis of the information available regarding its cost of production, if such cost exceeds the market value of the input (as determined under subsection 1677b(f)(2)).  19 U.S.C. §1677b(f)(3). Commerce

interprets the statute as permitting valuation of an affiliate party's major[16] input based on the highest of: (1) the actual transfer price for the input; (2) the market value of the input; or (3) the cost of producing the input. 19 C.F.R. §351.407(b).  Towards that end, Commerce will consider both the percentage of an individual input purchased from affiliated parties and the percentage each individual input represents in relation to the product's total cost of manufacturing, among other factors in that determination.  *See I&D Memo* at cmt. 10; *see, e.g., Stainless Steel Plate in Coils from Belgium*, 70 Fed. Reg. 72789 (Dec. 7, 2005) (final AD admin. review results) at cmt 1.

During the investigation, the DSMC argued to Commerce that the record shows that Ehwa owns [[        ]] of Weihai, its PRC subsidiary, that the inputs in question are major, *i.e.*, that the [[                    ]] purchased from Weihai were significant in quantity, accounting for [[

]] sold in the home market during the POI, and significant in total cost, accounting for [[       ]] percent thereof when calculated on the basis of the DSMC's estimate of the actual value of the [[                ]] rather than on the [[

]] Ehwa used for the calculation, and that Commerce has acknowledged that prices from an NME producer are inherently tainted because they are not based on market-determined factors.  *See* DSMC's Case Br., PDoc 528, CDoc 231, at 25-29; Major Input Allegation re Ehwa  (Dec. 12, 2005), PDoc 295, CDoc 103, at 5-6; *see also* Ehwa's Second Supp. Section A QR at Ex. 3 (Nov. 21, 2005), PDoc 257, CDoc 87; Ehwa's Section D QR at D-5, D-6 (Nov. 21, 2005), PDoc 256, CDoc 90; Rebuttal Br., PDoc 515, CDoc 217, at 10; Import Admin. Policy Bull. No. 94.1 (Mar. 25, 1994); *I&D*

---

[16]   Designed to evaluate whether the sale of a major input was made at arm's-length, the determination of whether an input is "major" is necessarily made on a case by case basis.  *See Huvis Corp. v. United States*, 32 CIT 845, 845 (2008); *Torrington Co. v. United States*, 25 CIT 395, 407-08, 146 F. Supp. 2d. 845, 865 (2001); *see also SAA* at 838, 1994 U.S.C.A.N. at 4174-75.

*Memo* at cmt. 12 ("the Act generally assumes that prices for goods produced in NMEs cannot be relied upon for purposes of a price-based analysis").  Similarly, the DSMC pointed out that Shinhan sources [[                                     ]] from TPC, [[                      ]] in the form of [[

[[                      ]] from TPC and Namdong, [[                                     ]] through TPC, and [[

[[                      ]] from Qingdao Shinhan. *See* Major Input Allegation re Shinhan (Dec. 12, 2005), PDoc 292, CDoc 105, at 2.  The DSMC thus urged Commerce to value such inputs using the same surrogate value factors of production analysis Commerce uses in determining normal value in non-market economy investigations.  *See* 19 U.S.C. §1677b(c).

Commerce agreed with the DSMC in part, and adjusted the respondents' purchases from affiliated suppliers to the higher of the reported transfer price or market value.  In passing, Commerce noted that 19 U.S.C. §1677b(f)(2) requires adjusting input cost to account for below market price transfer prices between affiliates, so for some of the inputs it used the respondent's cost of producing the input as a market surrogate.  But, it also "determine[d] that inputs purchased by Ehwa and Shinhan from affiliates are not significant in relation to the total costs incurred to produce subject merchandise and accordingly, are not major inputs".  *I&D Memo* at cmt. 10.

The DSMC argue Commerce's reasoning is conclusory and does not address their substantive arguments.  Responding, the defendant proffers percentages of the respondents' total cost of manufacturing accounting for the affiliated inputs.  It contends that Ehwa's purchase of the input [[                                     ]] accounted for only [[                      ]] of the total cost of manufacturing for all subject merchandise and that Ehwa's purchase of the input [[

[[                      ]] only accounted for [[                ]] of the total cost of manufacturing for all subject merchandise

Def.'s Br. at 43, referencing Ehwa's Supp. Sec. D (Jan. 17, 2006), CDoc 138 at 3-4.   Regarding

Shinhan, the defendant points out as fact that Shinhan sourced from Technoplus [[      ]] percent of

its [[          ]], [[      ]] percent of its [[          ]], [[      ]] percent of its [[          ]], and

[[    ]] percent of its [[             ]], which made up only [[      ]] percent, [[      ]] percent, [[    ]]

percent, and [[      ]] percent, respectively, of the cost of manufacturing. *Id*, referencing  Shinhan's

Section D Supp. QR, CDoc 132 at App. S-57. It also points out that the tolling services provided by

Technoplus and [[          ]] accounted for [[      ]] percent and [[      ]] percent, respectively, of all

the tolling services purchased and [[      ]] percent and [[      ]] percent, respectively, of the total cost

of manufacturing. *Id*., referencing *id*.  It further points out that the carbon and steel frames purchased

from [[        ]] accounted for [[      ]] percent of Shinhan's total carbon and steel frame purchases,

but represented only [[      ]] percent and [[      ]] percent, respectively, of the total cost of

manufacturing.  *Id*., referencing *id*.

     The DSMC reply that such reasoning is *post hoc*[17] and that to the extent the

calculations are based on unadjusted or non-market prices they therefore conflict with Commerce's

expressed opinions on such matters.  *See supra* & *I&D Memo* at cmt. 10 ("the transfer prices

between the respondents and their affiliates could be unreasonably low due to their affiliation") &

cmt. 12 ("the Act generally assumes that prices for goods produced in NMEs cannot be relied upon

for purposes of a price-based analysis").  Further, they contend the calculations do not address their

substantive point with respect to Ehwa that when the cost of the [[                ]] is adjusted to

---

     [17]  *See, e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U. S. 156, 168-69 (1962)
("courts may not accept . . . *post hoc* rationalizations for agency action"); *NEC Home Electronics,
Ltd.*, 54 F.3d at 743 (the court is "powerless to affirm an administrative action on a ground not relied
upon by the agency") (citation omitted).

reflect the actual value of the [[          ]] (as based on the [[          ]] of another [[     ]]

manufacturer) rather than "unrealistically low" (according to the DSMC) transfer prices, the [[

                                    ]] represent [[     ]] percent of Ehwa's total cost of manufacturing.

*See* PDoc 295, CDoc 103, at 6.  At this point, the court consider the DSMC's arguments unrebutted.

         Commerce also concluded that the inputs and services received from Shinhan's

affiliates do not constitute a significant percentage of Shinhan's total cost of manufacturing.  *See*

Def.'s Br. at 43-44.  This was apparently based upon Commerce's examination of Shinhan's

purchase of these inputs at verification, at which it verified that Shinhan had purchased them at

above the suppliers' costs of production even after adjusting for G&A expenses.  *See* Shinhan Cost

Verification Report, CDoc 193, at 28-29; Shinhan's Supp. Sec. D QR (Jan. 11, 2006), CDoc 132,

at App. S-57.  The DSMC contend that in order to reach this conclusion, Commerce again had to

have used the transfer prices that were supplied by Shinhan in its supplemental Section D

questionnaire response.  *See*  Def.'s Br. at 44.  The DSMC contend that although Shinhan claimed

that the transfer prices reflected market prices, it provided no documentation to support that claim.

*See* CDoc 105, PDoc 292 at 2.  They reiterate that Commerce recognized that transfer prices between

Shinhan and its affiliates are not a valid basis for comparison, and they also argue that even based

upon Commerce's calculated percentages at least some of Shinhan's purchases from affiliates should

have been considered "major" inputs, *e.g.,* the tolling services provided by TPC accounted for [[  ]]

percent of Shinhan's total cost of manufacturing, *see* Def.'s Br. at 44, and that Commerce in the past

has conferred major inputs status to material goods that constitute as little as two percent of the total

cost of production of a finished good.  *See Large Newspaper Printing Presses and Components*

*Thereof, Whether Assembled or Unassembled, from Japan*, 61 Fed. Reg. 38139, 38162 (July 23, 1996) (final LTFV determ.).

The defendant characterizes the DSMC's points as an invitation to re-weigh the evidence, and that Commerce in fact considered the inputs' *per*-affiliate percentages and cost ratios based on market prices for the inputs and each company's total cost of production ("COP"). The DSMC's points, however, present not a "choice of two fairly conflicting views" but substantial contradiction of Commerce's declaration and its precedent, and their points therefore detract from the reasonableness of the *Final Determination* as it stands. The issue as a whole requires fuller proof on the record by way of fuller explanation or reconsideration. If on remand Commerce continues to find 19 U.S.C. §1677b(f)(2) applicable, it shall further state why the respondents' cost of producing the input is a "reasonable surrogate" for the market price of the disregarded transaction(s) for which it found no comparative unaffiliated sales to use as a market price for comparison to the transfer price. *Cf Antidumping Manual*, Ch. 9, §II.D.1. ("[i]f a transaction is disregarded . . . and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated").

IX.  Non-Adjustment of Costs of Purchases From
Unaffiliated Non-Market Economy Suppliers

The DSMC also take issue with the fact that Commerce refused to adjust respondents' reported costs for inputs purchased from unaffiliated NME suppliers. *See I&D Memo* at cmt. 12. Commerce will "normally" use the costs as recorded in the respondent's books and records in calculating COP if: (1) those records are kept in accordance with the respondent's home country's

generally accepted accounting principles, and (2) those recorded costs reasonably reflect the costs

associated with the production and sale of the subject merchandise.  19 U.S.C. §1677b(f)(1).  *See*

*Magnesium Metal from the Russian Federation*, 70 Fed. Reg. 9041, 9043 (Feb. 24, 2005) (final

LTFV determ.).  For an NME producer, 19 U.S.C. §1677b(c) requires a factors-of-production based

methodology.  Consequently, Commerce will not use a price-based method for such producers unless

the record evidence demonstrates that a market-oriented industry exists.  *See* 19 C.F.R. §351.408.

For the *Final Determination*, Commerce stated that it had

> reviewed the relative percentages that these inputs represent of the respondent's COP
> and compared the NME prices to either market based prices or the cost of producing
> the input. We have determined that the use of such prices does not result in an
> unreasonable reflection of the cost associated with the production and sale of the
> merchandise. Thus, while we may consider this issue in future cases, for the final
> determination in this case we have not restated the prices recorded by respondents for
> inputs purchased from NME suppliers.

*I&D Memo* at cmt. 12.

Defending this conclusion, the government points to the example of Ehwa's

purchases of [[      ]] from [[            ]], which constituted only [[      ]] percent (by volume) and

[[    ]] percent (by value) of Ewha's total purchases of cores during the period of investigation and

only [[            ]] of Ehwa's total costs.  Def's Resp. at 46, referencing Ehwa Supp. Sec. D QR,

PDoc 159, CDoc 133 (Jan. 11, 2006), at SD-3; Ehwa Second Supp. Sec. A QR, PDoc 257, CDoc

87 (Nov. 21, 2005), at 9.  It argues that when considering the record evidence, Commerce reasonably

determined that Ehwa's inputs from unaffiliated NME suppliers were not major and did not result

in an unreasonable reflection of Ehwa's COP for subject merchandise.  *Id.*, referencing *Consolo*,

*supra*, 383 U.S. at 620.

The DSMC contend that Commerce's calculation results from using the NME values of the sourced inputs, and they remind that elsewhere Commerce has recognized the inherent distortions in NME transfer prices, that the record shows that prices from NME suppliers in this investigation were significantly below market prices insofar as Commerce verified that both the market price and self-production costs for the inputs purchased from such NME suppliers [[                                                                                          ]], PDoc 515, CDoc 217, at 10, and that the conclusion that the "amount" of inputs sourced from unaffiliated NME suppliers was "negligible" is itself undercut by the referenced fact that Ehwa purchased [[            ]] by value of its [[      ]] from one unaffiliated NME supplier.

Commerce did not determine that the "amount" was negligible but "that any distortion they may create as percentage of the respondents' total COP is negligible." *I&D Memo* at cmt. 12. Nonetheless, the DSMC's allegation directly contradicts Commerce's simple declaration of comparison of the NME prices of the inputs to market-based prices or the COP of the input. Since the prices of inputs sourced from *all* of Ehwa's NME suppliers are indeed relevant, and since the determination is that the NME prices themselves do not unreasonably reflect the cost associated with the production and sale of the subject merchandise, a fuller explanation of, and/or redetermination on, those comparisons upon remand would assist the court's and parties' understanding. *See supra*.

X.  Use of Facts Otherwise Available or Adverse Inferences

The DSMC also contest Commerce's calculation of Shinhan's financial expense rate. Shinhan provided as part of its Section A questionnaire responses the audited unconsolidated financial statements for itself and each of its affiliated companies. *See* Shinhan's Section A QR,

CDoc 47 at Exs. A-11 to A-16.  Commerce instructed Shinhan via the the Section D questionnaire to calculate its financial expense based on the consolidated audited fiscal year financial statements of the highest consolidation level available.  *See I&D Memo* at cmt. 44.  At verification, Commerce "discovered that Shinhan had not provided the financial statements of its parent company TPC and had not reported its financial expense rate as instructed, and Commerce requested Shinhan to submit TPC's consolidated financial statements.  *See* Shinhan's Verification, PDoc 312 (Apr. 4, 2006). Shinhan complied.  Although Commerce's verification report provides the caveat "[t]his report does *not* draw conclusions as to whether the reported information was successfully verified, and further does *not* make findings or conclusions regarding how the facts obtained at verification will ultimately be treated," Shinhan Cost Verification Report, CDoc 193 at 1 (emphasis in original), Commerce recalculated Shinhan's expense ratio based on the newly submitted information, and the *I&D Memo* holds as sufficient that "[d]uring the verification, the Department analyzed TPC's consolidated financial statements and compared them to TPC's unconsolidated financial statements".

The DSMC contended the situation compelled the use of facts otherwise available or adverse inferences under 19 U.S.C. §1677e, arguing in their administrative rebuttal brief that Shinhan's late filing had deprived them of any meaningful opportunity to analyze and comment upon the financial statements.  *Cf*. PDoc 255, CDoc 89 (Nov. 22, 2005).  After noting that the argument was improperly raised by way of rebuttal, Commerce rejected it on the merits by reasoning that it had the authority to request and accept Shinhan's information for TPC pursuant to 19 C.F.R. §351.301(b)(1).  "While we agree with the petitioner that Shinhan should have provided these financial statements when initially asked, we do not believe Shinhan intentionally failed to do so in

an effort to impede the investigation.  Accordingly, we do not deem it appropriate to resort to facts available with regard to calculating the interest expense rate for Shinhan." *I&D Memo* at cmt. 44.

There are two distinct parts of 19 U.S.C. §1677e that respectively address two distinct circumstances of administrative receipt of less than the full and complete facts needed to make a determination. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  In either circumstance, "Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference." *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011) (citation omitted).  To do so, Commerce must follow the statutory outline governing the propriety of that determination.  The first part, of section 1677e, subsection (a) ("In general"), provides that if --

(1) necessary information is not available on the record, *or*

(2) an interested party or any other person--

    (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
    (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
    (C) significantly impedes a proceeding under this subtitle, or
    (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

the administering authority and the Commission *shall*, *subject to section 1677m(d)* of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. §1677e(a) (italics added).

Commerce's regulation interpreting the above provisions provided (during the investigatory proceeding) in relevant part as follows:

> (a) Introduction. The Secretary *may* make determinations on the basis of the facts available *whenever* necessary information is not available on the record, an interested party or any other person withholds or fails to provide information requested in a timely manner and in the form required or significantly impedes a proceeding, or the Secretary is unable to verify submitted information.

19 C.F.R. §351.308 (2005--2006) (italics added).

The DSMC emphasize that the Court of Appeals for the Federal Circuit stated "[t]he mere failure of a respondent to furnish requested information -- for any reason -- *requires* Commerce to resort to other sources of information to complete the factual record on which it makes its determination". *Nippon*, 337 F.3d at 1381 (italics added). The DSMC contend that whether Commerce believed that Shinhan had not significantly impeded the investigation, or that the necessary information was (eventually) on the record, Shinhan failed to provide information by the deadlines for submission of its Section D questionnaire response in the form and manner requested by Commerce. DSMC Reply at 19, referencing 19 U.S.C. §1677e(a)(2)(A)&B).

The argument, in effect, is that whenever, at a particular point in time, there is less-than-perfect compliance with an administrative request for information, resort to facts otherwise available is required in that circumstance. *See Nippon*. 19 C.F.R. §351.308 also appears to support the proposition. But, the relevant and operative point in time for determining whether "necessary information is not available on the record" is at that point in time when Commerce must "use the facts otherwise available in *reaching* the applicable determination", 19 U.S.C. §1677e(a) (italics added), not "whenever" the necessary information is not available on the record.

Be that as it may, 19 C.F.R. §351.301, the regulation governing time limits for submission of factual information, provided in relevant part as follows during the investigation:

(b) *Time limits in general*. Except as provided in paragraphs (c) and (d) of this section and §351.302, a submission of factual information is due no later than:
(1) For a final determination in . . . an antidumping investigation, seven days before the date on which the verification of any person is scheduled to commence, except that factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed[.]
* * *
(c) *Time limits for certain submissions*--
* * *
(2) *Questionnaire responses and other submissions on request*.
(i) Notwithstanding paragraph (b) of this section, the Secretary may request any person to submit factual information at any time during a proceeding.
(ii) In the Secretary's written request to an interested party for a response to a questionnaire or for other factual information, the Secretary will specify the following: the time limit for the response; the information to be provided; the form and manner in which the interested party must submit the information; and that failure to submit requested information in the requested form and manner by the date specified *may* result in use of the facts available under [19 U.S.C. 1677e] and [19 C.F.R.] §351.308.

19 C.F.R. §351.301(b)&(c) (2005--2006) (italics added in part).

And, as noted, Commerce, relied on the latter part of subsection (b)(1), above, to find that necessary information was not missing from the record; thus, the information concerning TPC was simultaneously "discovered" missing and "requested" by Commerce at verification. Such an interpretation obviates, or obfuscates, the fact that the information had been requested from Shinhan at an earlier point in time, and had been due in accordance with the first clause of section 351.308(a) as well as subsection 351.301(c)(2)(ii), governing written requests.

A failure to provide timely, mannerly or formally factual submissions is "subject to" the "deficient submissions" provision of 19 U.S.C. §1677m(d). This provision curtails the ability to reject information that is necessary for the administrative record and has otherwise been properly submitted, subject to the following conditions. When Commerce makes any of the enumerated

"final" determinations in section 1677m(e) (including the determination at bar), Commerce "shall

not decline to consider information that is submitted by an interested party and is necessary to the

determination but does not meet all the applicable requirements established" by Commerce if (1) the

information is submitted by the deadline established for its submission, (2) the information can be

verified, (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching

the applicable determination, (4) the interested party has demonstrated that it acted to the best of its

ability in providing the information and meeting the requirements established by Commerce with

respect to the information, and (5) the information can be used without undue difficulties.  19 U.S.C.

§1677m(e).  In addition, 19 U.S.C. §1677m(d) requires that from the time Commerce determines

that a response to a request for information does not "comply" with its prior request, it must

"promptly" inform the person submitting the information of the nature of the deficiency and provide

an opportunity to remedy or explain the deficiency "in light of the time limits established for the

completion" of the administrative proceeding.  The statute provides Congress' expectation of how

the unexpected discovery of  information missing from the record is to be addressed, whether at

verification or otherwise.   And, Commerce is to be accorded "substantial" deference in the

reasonable interpretation of the AD statute and its own regulations.  *See*, *e.g.*, *Torrington Co. v.

United States*, 156 F.3d 1361, 1363 (Fed. Cir.1998).

        However, administrative discretion, over the "required" use of facts otherwise

available in the face of less-than-perfect compliance with a request for information, is not

unrestricted.  Commerce cannot, of course, engage in partisanship, *cf.*, *e.g.*, 19 C.F.R. §351.301(c)(2)

(2005) (Commerce "may" request any person to submit factual information at any time during a

proceeding and "will" specify in its written request for a written response to a questionnaire or for

other factual information that failure to submit requested information in the requested form and

manner by the date specified "may" result in use of the facts available), nor can it deprive a party of

meaningful opportunity to analyze and comment upon any significant new factual development, *cf*

*id*. *with* 19 C.F.R. §351.301(c)(1) (2005) (providing ten days after submission of factual information

for a non-submitter to rebut) *and with China Kingdom Import & Export Co., Ltd. v. United States*,

31 CIT 1329, 1350, 507 F. Supp. 2d 1337, 1357 (2007) (noting that defendant's argument that

verifying and using substitute information "would be unfair to the petitioners and other interested

parties in the proceeding by depriving them of an opportunity to meaningfully comment").  The

"discovery" of any necessary factual material that had been missing from the record to that point

necessarily triggers a section 1677e(a)(1) analysis, in order that the record should reflect why the

information was missing, and regardless of whether the information is subsequently deemed

acceptable for the record and proper for consideration.

       Here, Commerce stated that it "do[es] not believe Shinhan intentionally failed to

[disclose] in an effort to impede the investigation," thus providing explanation, albeit cursory, that

might in some context satisfy section 1677e(a)(2)(C).  But Commerce does not provide further

context or commentary to satisfy section 1677e(a)(2)(B), and the record is reviewably vague as to

what called Commerce's attention to Shinhan's non-provision of TPC's consolidated financial

statements. *Cf*. PDoc 312 at 3 ("[a]t verification, we discovered that SDC's parent, TPC[,] prepared

consolidated financial statements for the year end 2004").  It is undisputed that Commerce

"instructed Shinhan to calculate its financial expense based on the consolidated fiscal year financial

statements of the highest consolidation level available," and that "Shinhan did not provide the

financial statements of its parent company (TPC), which were the highest level of consolidated

financial statements." Def.'s Br. at 47.  Was it the case that TPC had not yet prepared consolidated financial statements by the time Shinhan submitted its responses to Commerce's questionnaire requests?  If TPC had, then even if Commerce's Section D request to Shinhan could reasonably be construed as expressing patent ambiguity regarding the information requested, the DSMC here are no less correct that Commerce's acceptance and incorporation of TPC's consolidated financial statements into the *Final Determination* without addressing each relevant section 1677e(a) factor would appear to be an abuse of discretion and therefore not in accordance with law: the burden would have been on Shinhan to seek clarification prior to responding in that circumstance.  But if, as a result of its "discovery" of the missing information at verification,  Commerce concluded that its prior Section D request had presented some reasonably latent or inconspicuous ambiguity that was revealed only in light of Shinhan's prior response(s) to the question(s) posed (*i.e.*, Shinhan's interpretation of the questions asked could be construed as reasonable and therefore excusable), and that the failure to produce TPC's consolidated financial statement was unintentional and inadvertent, then the request therefor at verification would fall squarely within 19 U.S.C. §1677m(d), and the ultimate conclusion Commerce reached might not be unreasonable.  As the court cannot discern which is the circumstance at bar, it requests guidance via reconsideration on remand.

       In addition, the DSMC vociferously argue that the circumstance called for application of adverse inferences and that Commerce must address the statutory standard for its application -- whether the respondent failed to cooperate by not acting to the best of its ability regardless of motive or intent; *see Nippon Steel Corp.*, 337 F.3d at 1383 -- including examination in accordance with agency practice of the extent to which the respondent may benefit from its own lack of cooperation. *See Gourmet Equipment (Taiwan) Corp. v. United States*, 24 CIT 572, 577 (2000) ("Commerce is

to consider the extent to which a party may benefit from its own lack of cooperation"), citing *SAA* at 870, 1994 U.S.C.C.A.N. at 4199.  Since Commerce must first determine whether resort to facts available is appropriate, further discussion of that contention is here deferred, although Commerce may choose to address it on remand.

## XI.  Use of Zeroing

The defendant-intervenors' Rule 56.2 motions for judgment focus again on Commerce's use of zeroing to  argue it was unreasonable for Commerce not to have determined that the investigation was "pending" for purposes of the applicability of Commerce's change of policy on zeroing in investigations announced in *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77722 (Dec. 27, 2006), with effect from January 16, 2007.  According to them, because Commerce had not yet issued its AD order when the URAA section 123 proceeding that underpins that announced "final modification" was concluded, the investigation of diamond sawblades from Korea was allegedly "pending" and therefore covered by that section 123 determination.

This court has previously rejected similar challenges on two occasions in the appeals of the diamond sawblades from the PRC investigation.  *See Advanced Technology & Materials Co. v. United States,* 35 CIT ___, Slip Op. 11-105 (Aug. 18, 2011) ("*Advanced Tech I*") at 13-16.  In that case, the Court recognized that Commerce's "policy change with respect to 'zeroing[ ]' . . . became effective after the final determination . . . but before issuance of an [AD] order." *Advanced Tech I* at 2 (footnote omitted).  The court considered that

> the question that Commerce needed to resolve here did not require a survey of the
> various alternative ways that an investigation might be termed "pending"; the task,
> rather, was to interpret the meaning of that term *as it was used in the Section 123*

> *Determination*.  More precisely, to determine which investigations the Department
> was describing [in that Determination] when it referred to "all investigations pending
> before the Department."

*Id*. at 15 (italics added). The court concluded that Commerce had properly determined that the

diamond sawblades investigation was not one of those "pending" before the agency (and to which

the section 123 determination specifically alluded), and therefore Commerce had properly

determined that the diamond sawblades investigation "did not qualify for the policy change."  *See*

*id*. at 25; *see also Advanced Tech II*, *supra*,  at 2 n.1 ("[T]he court . . . need not address ATM's first

contention because argument thereon was addressed in Slip Op. 11-105. To the extent any arguments

remain, past precedent of this Court has shown them to be without merit.").

There are no material factual or legal distinctions between this case and past

precedent.  The court will therefore dismiss the defendant-intervenors's challenge to Commerce's

use of zeroing methodology in the *Final Determination*.

The defendant-intervenors argue that *Advanced Tech I* is inapplicable because it was

decided under the arbitrary and capricious standard of review accompanying actions challenging

changed circumstances reviews brought under 28 U.S.C. §1581(i), whereas this case is brought

pursuant to 28 U.S.C. §1581(c) to challenge a less than fair value determination. *See* Shinhan Br.

at 17 n.1; Ehwa Br. at 10-11.  That is not a valid distinction.  *Advanced Tech II* concerned an LTFV

challenge instituted pursuant to section 1581(c), and the opinion relied exclusively upon the

reasoning contained in *Advanced Tech I* as determinative.  The respondents' claim in *Advanced Tech*

*I* was that the diamond sawblades investigation did not "properly receive" the benefit of that section

123 determination.  The court found jurisdiction over such a claim in section 1581(i).  That does not

mean, however, that the court entertained jurisdiction over the section 123 determination itself.  If

a party believed Commerce should have included a particular LTFV investigation within the section

123 determination as one of those "pending" before Commerce, the party had the opportunity to

challenge that in a separate proceeding, but attempting to characterize such a claim as "subject to"

section 1581(c) jurisdiction, in the context of a LTFV challenge, would be subject to dismissal.

The defendant-intervenors argue that according to 19 C.F.R. §351.211(a) and

§351.102(b)(30), an "investigation" is "pending" beyond the issuance of a final LTFV determination

up until the issuance of an AD order.  *See* Shinhan Br. at 20-23; Hyosung Br. at 8-11.  However, as

before, the legal definitions of the term "pending" that defendant-intervenors would advance here

are "ultimately immaterial" to the issue of whether the investigation of diamond sawblades from

Korea was "pending" before Commerce.  Insofar as what may properly be considered within the

context of this matter is concerned (*i.e.*, the section 1581(i) jurisdictional issue), Commerce "would

have no legal authority to apply the section 123 determination in a manner that ignores the express

legal directive set forth therein" in any event.[18]  *See Advanced Tech I* at 24.

Further, it was not inconsistent with its regulations for Commerce to interpret the

section 123 determination's meaning of "pending" as meaning those proceedings that were in the

midst of (and subject to) further proceedings before it prior to the final LTFV determination

---

[18]  And, in any event, neither of those regulations defined "pending," either in 2006 or
currently.  In 2006, section 351.102 defined (and section 351.102(b)(30) currently defines) the term
"investigation" as "that segment of a proceeding that begins on the date of publication of notice of
initiation of investigation and ends on the date of publication of the earliest of: (i) Notice of
termination of investigation, (ii) Notice of rescission of investigation, (iii) Notice of a negative
determination that has the effect of terminating the proceeding, or (iv) An order."  The "order"
referenced in section 351.102 is also referenced in section 351.211(a), and likewise then as now:
"The Secretary issues an order when both the Secretary and the Commission . . . have made final
affirmative determinations. The issuance of an order ends the investigative phase of a proceeding."

issuance. The defendant-intervenors apparently expand the meaning of the pendency of the LTFV investigation before Commerce into the pendency of the investigation as a whole, including the injury investigation before the ITC, but the regulations differentiate between investigation proceedings before Commerce that lead up to the "final affirmative determination," 19 C.F.R. §351.211(a), and the overall investigation proceedings before both Commerce and the ITC that ultimately lead to an AD order. *See id.*

The publication of an AD order is a purely ministerial act. *Royal Business Machines, Inc. v. United States*, 1 CIT 80, 86, 507 F. Supp. 1007, 1012 (1980). Irrespective of that, once Commerce issues its final LTFV determination, no issues are "pending" before Commerce, and nothing in the statute or regulations suggests that Commerce could continue its proceedings, accept more submissions, or change its decision after it issued its final determination in its investigation. Rather, the statute and regulations contemplate that, if Commerce issues an affirmative less than fair value determination, and the ITC issues an affirmative injury determination, an order should issue. Indeed, the parties' own behavior confirms the finality of these individual steps. The DSMC appealed the *Final Determination* to this court in 2006, long before Commerce issued the AD order. But the statute contemplates this, confirming that the *Final Determination* was indeed "final" and not "pending" at the time that Commerce issued its section 123 determination. *See* 19 U.S.C. §§ 1516a(a)(2)(B)(i), 1673d. Equally obvious is that if the determination was still "pending," then it was not "final," and the court would have had no jurisdiction to entertain a challenge to it.

*Sub silencio*, the court has also considered the defendant-intervenors remaining arguments, in particular those concerning inconsistency in abandonment of zeroing in investigations

but not in administrative reviews, but finds they do not merit further discussion.  *See*, *e.g.*, *Union Steel v. United States*, 36 CIT ___, 823 F. Supp. 2d 1346, *aff'd*, 713 F.3d 1101 (Fed. Cir. 2013).

*Conclusion*

For the above reasons, *Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 Fed. Reg. 29310 (May 22, 2006), as amended by *Diamond Sawblades and Parts Thereof from the Republic of Korea*, 75 Fed. Reg. 14126 (Mar. 24, 2010), is hereby remanded to the International Trade Administration, U.S. Department of Commerce for further proceedings not inconsistent with this opinion.

The parties shall provide comment, or indication of none, on the sufficiency of the information indicated to be redacted from the confidential version of this opinion (indicated above by double bracketing) to the Clerk of the Court within seven (7) days, including any indication of information that should be but is not presently indicated as subject to redaction.

The results of remand shall be due Monday, February 3, 2014, comments thereon by Monday, March 3, 2014, rebuttal by Friday, March 28, 2014.

**So ordered**.

      /s/  R. Kenton Musgrave           
R.  Kenton Musgrave, Senior Judge

Dated: October 11, 2013
      New York, New York